**STEVEN AMES BROWN**
Entertainment Law 83363
69 Grand View Avenue
San Francisco, California 94114-2741
415/647-7700 Tele
415/285-3048 Fax
sabrown@entertainmentlaw.com

**THERESE Y. CANNATA** SBN 88032
Cannata, Ching & O'Toole, LLP
100 Pine Street
San Francisco, California 94111
415/409-8900 Tele
415/409-8904 Fax
tcannata@ccolaw.com

Attorneys for Plaintiff Brown

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

|  |  |
|---|---|
| STEVEN AMES BROWN,<br><br>        Plaintiff,<br><br>    v.<br><br>ANDREW B. STROUD, an individual<br>and *dba* STROUD PRODUCTIONS AND<br>ENTERPRISES, INC.<br><br>        Defendant.<br>_____/<br><br>AND RELATED CLAIMS<br>_____/ | CIVIL NO. 08-02348 JSW (NC) (DMR)<br><br>APPLICATIION FOR ORDER<br>TO SHOW CAUSE RE:<br>SANCTIONS |

Plaintiff Steven Ames Brown hereby applies for an order to show cause against attorney W. Charles Robinson why he should not be sanctioned for violating this Court's order in *Document 559*, the Standards of Professional Conduct set forth in Civil Local Rule 11-4(a)(3) and (4) which require attorneys to "(m)aintain respect due to courts of justice and judicial officers" and "(p)ractice with the honesty, care, and decorum required for the fair and efficient administration of justice" and for violating of Business & Professions Code § 6068(d).

Previously, this Court admonished Mr. Robinson not to again to represent that he attempted to deliver to the Court his November 20, 2012 letter before March 18, 2013. "Mr. Robinson is admonished that he shall not continue to represent that the Court was informed of the letter dated November 20, 2012 at any time before March 18, 2013. Violations of this order will be sanctioned, payable directly by Mr. Robinson." *Brown v. Stroud, Document 559,* pg.: 3:3-22.

Despite that direct order, Mr. Robinson twice substantively repeated the sentence and in response thereto, his *pro hac vice* status was revoked and he was sanctioned $5,000.00 by an order entered as *Methven v. Paradies-Stroud, Document 86,* pg. 1-2. Astonishingly, Mr. Robinson has again filed a brief in this case repeating the same misleading contention. "In addition, counsel for the Stroud Estate sent a letter to the Court on November 20, 2012, in an attempt to advise the Court that no representative had been appointed to represent the Stroud Estate." *Document 590,* pg 7:19-21. A true copy of the brief is annexed hereto as *Exhibit 1.* Mr. Robinson even attached the purported letter as an exhibit. *Exhibit 1, Document 590-1,* pg. 4.

The brief was addressed to Magistrate Judge Cousins and not only did Mr. Robinson again violate the Court's order concerning the November 20, 2012 letter, but he attempted to mislead Judge Cousins into reversing this Court's rulings concerning service of process on Mrs. Stroud.

Previously the Court referred the pending default judgment applications to Judge Cousins for a report and recommendation. Judge Cousins requested further briefing from the Nina Simone estate with a return date of January 15, 2014, allowing the remaining parties the

option of filing a responding brief by January 22, 2014. *Document 587.* Although the Court has stricken all the Stroud parties' pleadings and entered their defaults in *Brown v. Stroud, Kelly v. Roker* and *Stroud Productions v. Castle Rock*, and revoked Mr. Robinson's *pro hac vice* status he filed the brief on their behalf in this and two related actions. *Kelly v. Roker, Document 194,* and *Stroud Productions v. Castle Rock, Document 143.*

In the brief Mr. Robinson argued that Mrs. Stroud had never been properly served with process and that she was improperly joined as Mr. Stroud's successor pursuant to F.R.Cv.P. 25. *Exhibit 1, Document 590*, pg. 12-20. In short, Mr. Robinson reargued the very same points on which this Court had already ruled in *Document 563.* Far more troubling than the fact that it was an improper application for reconsideration was his failure to disclose to Judge Cousins that that it was a reconsideration application at all.

Specifically, Mr. Robinson attempted to mislead Judge Cousins into thinking these issues were before him and not already decided by this Court. He literally asked Judge Cousins to reverse this Court's prior order without disclosing the fact that it exists. Mr. Robinson does briefly allude to the substance of his prior motion at *Document 590,* pg. 8:27-9:4. However, all he said about this Court's subsequent order was that it "refused to vacate the Substitution Order". *Exhibit 1, Document 590,* pg. 9:5-8. Three pages later, Mr. Robinson repeated his prior challenge to personal service on Mrs. Stroud but nowhere did he directly inform Judge Cousins that this Court had already ruled on that issue.

The issue here isn't whether there were enough clues for Judge Cousins to piece together that the specific challenge had already been ruled upon, but instead that Mr. Robinson clearly attempted to mislead Judge Cousins into thinking he had the service of process issue before him. Moreover, Mr. Robinson's actions evidence yet another instance of contempt for this Court's orders. This Court ruled on that very issue and it's nothing short of contempt for both courts for him to present the same issue to another judge, especially without full and fair disclosure. His conduct is deceitful, disrespectful and disgraceful. Clearly, having his *pro hac vice* status revoked and being sanctioned $5,000.00 hasn't altered his behavior in the least. Indeed, he hasn't even paid the sanction.

Mrs. Stroud's conduct isn't substantially better.  She managed to file a declaration in this case on January 22nd.  *Exhibit 1, Document 590-3.*  However, she completely ignored the order issued in *Methven v. Paradies-Stroud* that she file a response to an OSC by January 17th.  *Methven v. Paradies-Stroud, Document 86,* pg. 2:14-3:3.  She was on actual notice of the requirement because there is a proof of service on her filed as *Methven v. Paradies-Stroud, Document 87.*

Further judicial action is warranted.   The Stroud briefs & declarations should be stricken and appropriate further sanctions imposed on Mr. Robinson.

Dated: January 27, 2013

Respectfully submitted,

/s/

STEVEN AMES BROWN,
Plaintiff in *pro se*

1   Pursuant to Local 3-4(a) (1), please see signature page for list of parties.

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

10  STEVEN AMES BROWN,

11          Plaintiff,                    C 08-02348 JSW

12      v.                                C 09-03796 JSW

13  ANDREW B. STROUD, et al.,             C 11-05822 JSW

14          Defendants.

15  _____/          **FURTHER BRIEF ON THE ISSUE OF**
16                                         **JURISDICTION OF DISTRICT COURT**
17  ANDREW B. STROUD, et al.,

18          Plaintiffs,

19      v.                                Date:  January 22, 2014

20  CASTLE ROCK ENTERTAINMENT, et al.,    Magistrate:  Hon. Nathanael M. Cousins

21          Defendants.

22  _____/

23  LISA SIMONE KELLY,

24          Plaintiff,

25      v.

26  WALLY ROKER, et al.,

27          Defendants.

Exhibit 1

1
2                                     TABLE OF CONTENTS
3
4       TABLE OF AUTHORITIES…………………………………………………….…………ii
5
6       ISSUES TO BE DECIDED……………………………………………………………1
7
8       RELEVANT FACTS…..………………………………………………………………1
9
10      ARGUMENT………………………………………………………………………...4
11
12              1.      THE COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION IN
13                      *BROWN V. STROUD* PURSUANT TO THE COPYRIGHT ACT……………...4
14
15              2.      THE COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION IN
16                      *BROWN V. STROUD* BASED UPON DIVERSITY……………………………5
17
18              3.      THE COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION IN
19                      *KELLY V. ROKER*…………………………………………………………7
20
21              4.      THE COURT DOES NOT HAVE PERSONAL JURISDICTION………………7
22
23
24      CONCLUSION………………………………………………………....………………..16

Exhibit 1

1
2
3                                    **TABLE OF AUTHORITIES**
4
5    **CASES:**
6
7
8    **_Allianz Ins. Co v. Otero,_**  353 F. Supp. 2d 415 (2004)…………………………….……..9
9
10   **_Allstate Ins. Co. v. Obdyke,_** 235 A.D. 2d 533, 652 N.Y.S. 2d 763 (2 Dept. 1997)………10
11
12   **_Atkins v. City of Chicago,_** 547 F. 3d 869 (C.A. 7 (Ill) (2008)……………………………13
13
14   **_Barlow v. Ground,_** 39 F. 3d 231 (9th Cir.1994)………………………………………13
15
16   **_Board of Managers of Le Trianon Condominium v. 1439 Realty Corp.,_** 186 A.D. 2d
17   437, 588 N.Y.S. 2d 565 (1992)…………………………………………………………10
18
19   **_Bonita Packing Co. v. O'Sullivan,_** 165 F.R.D. 610, C.D. Cal 1995……………………12
20
21   **_Brown v. Konczeski,_** 242 A.D. 2d 847, 662 N.Y.S. 2d 891 (3d Dept 1997)……………...14
22
23   **_Citadel Management, Inc. v. Telesis Trust, Inc.,_** 123 F. Supp. 2d 133 (2000)…………..10
24
25   **_Colonial National Bank, U.S.A. v. Jacobs,_** 188 Misc. 2d 87, 727 N.Y.S. 2d 237 (2000)..10
26
27   **_Community for Creative Non-Violence v. Reid,_** 490 U.S. 730 (1989)……………………4
28
29   **_Costine v. St. Vincent's Hops. & Medical Center of New York,_** 173 A.D. 2d 422,
30   570 N.Y.S. 2d 50 (1 Dept. 1991)…………………………………………………………10
31
32   **_County of Nassau v. Letosky,_** 34 A.D. 23d 414, 824 N.Y.S. 2d 153 (2 Dept. 2006)……..9
33
34   **_Cowan, Liebowitz & Latman, P.C. v. New York Turkey Corp.,_** 111 A.D. 2d 93, 489
35   N.Y.S. 2d 226 (1 Dept. 1985)…………………………………………………………...10
36
37   **_Cranford v. U.S._** 359 F. Supp. 2d 981, E.D. Cal. 2005…………………………………12
38
39   **_Faculty Practice Plan of Long Island Jewish Medical Center v. Guarneri,_** 13 Misc. 3d
40   302, 822 N.Y.S. 2d 389 (2006)…………………………………………………….……9
41

Exhibit 1

1  *F.A. Mfg. Co. v. Hayden & Clemons,* 273 F. 374 (1st Cir. 1921)……………………………15
2
3  *Galuski v. Tutunjian,* 133 A.D. 2d 480, 519 N.Y.S. 2d 155, *appeal denied* 70 N.Y. 2d
4  606, 519 N.Y.S. 2d 1029, 513 N.E. 1309 (3 Dept. 1987)………………………………........10
5
6  *Graham v. Henderson,* 224 F.R.D. 59 (N.D.N.Y. 2004)………………………………………14
7
8  *Gray v. Giannikios,* 90 A.D. 3d 836, 935 N.Y.S. 2d 112 (2 Dept. 2011)……………………11
9
10  *Hickory Travel Systems, Inc. v. TUI AG,* 213 F.R.D. 547, N.D. Cal. 2005…………………12
11
12  *In Re Baycol Products Litigation,* 616 F. 3d 778 (8th Cir. 2010)……………………………14
13
14  *In re Estate of Einstoss,* 26 N.Y. 2d 181, 309 N.Y.S. 2d 184, 257 N.E. 2d 637 (1970)….......14
15
16  *In re Tuli,* 172 F. 3d 707, 712 (9th Cir. 1999)…………………………………………………1
17
18  *Kernisant v. City of New York,* 225 F.R.D. 422 (E.D.N.Y. 2005)……………………………14
19
20  *Lew v. Moss,* 797 F. 2d 747 (9th Cir. 1986)……………………………………………………6
21
22  *Matter of Estate of Garfinkle,* 119 A.D. 911, 500 N.Y.S. 2d 863 (3 Dept. 1986)……………15
23
24  *Mooney Aircraft, Inc. v. Donnelly,* 402 F. 2d 400, 406 (5th Cir. 1968)………………………12
25
26  *Newman-Green, Inc. v. Alfonzo-Larrain,* 490 U.S. 826, 828, 104 L. Ed 2d 893,
27  109 S Ct 2218 (1989)……………………………………………………………………………5
28
29  *New York State Nat. Organization for Women v. Terry,* 961 F. 2d 390, *certiorari*
30  *granted, vacated, vacated Pearson v. Planned Parenthood Margaret Sanger Clinc*
31  *(Manhattan),* 113 S. Ct. 1233, 507 U.S. 901, 122 L. Ed. 2d 640, *on remand* 996 F. 2d
32  1351, *certiorari granted, vacated* 114 S. Ct. 2776, 512 U.S. 1249, 129 L. Ed. 2d 888,
33  *on remand* 41 F. 3d 794, C.A. 2 (N.Y.) 1992………………………………………………........12
34
35  *O'Connell v. Post,* 27 A.D. 3d 630, 811 N.Y.S. 2d 441 (2 Dept. 2006)…………………….…11
36
37  *Palandjian v. Pahlavi, D.C. Mass.,* 586 F. Supp. 671 (1984)…………………………………..10
38
39  *Reliance Audio Visual Corp. v. Bronson,* 141 Misc. 2d 671, 534 N.Y.S. 2d 313 (1988)...........10
40
41  *Rosen v. Weinger,* 116 A.D. 2d 636, 497 N.Y.S. 2d 483 (2 Dept. 1986)…………………………10

Exhibit 1

*Select Creations, Inc. v. Paliafito Am., Inc.,* 830 F. Supp. 1223, 1237-1238
(E.D. Wis. 1993)…………………………………………………………………...........12

*Serraro v. Staropoli,* 94 A.D. 3d 1083, 943 N.Y.S. 2d 201 (2 Dept. 2012)..………………………9

*Smith v. Planas,* 151 F.R.D. 547 (S.D.N.Y. 1993)…………………………………………...15

*Swaim v. Moltan Co.,* 73 F. 3d 711, *certiorari denied Gurley v. Swaim,* 116 S. Ct. 2499,
517 U.S. 1244, 135 L. Ed. 2d 191, C.A. 7 (Ind.) 1996………………………………………12

*U.S. v. Currency $11,331,* 482 F. Supp. 2d 873 (E.D. Mich. 2007)……………………………13

*Velocity Investments, LLC v. McCaffrey,* 31 Misc. 3d 308, 921 N.Y.S. 2d 799 (2011) ...........9

**STATUTES:**

CPLR § 308.4……………………………………………………………….………..8,9,11,12


**RULES:**

FRCP 25…………………………………………………………………………….7,8,9,13,14

FRCP 4………………………………………………………………………………………7,8

Exhibit 1

**ISSUES TO BE DECIDED**

The issues to be decided are whether the district court has (1) subject matter jurisdiction and (2) personal jurisdiction of the parties in the cases ***Brown v. Stroud*** and ***Kelly v. Roker*** for purposes of preparing a report and recommendation on pending motions for default judgment in these cases.

The order of the Magistrate Judge Nathanael M. Cousins ("Magistrate") dated December 18, 2013 required further briefing ("FBO") from the Estate of Nina Simone ("Simone Estate") in the cases ***Brown v. Stroud*** and ***Kelly v. Roker***. (587, 191)  The FBO was issued by the Magistrate after the Court held a hearing at which Defendants and Counterclaimants Andrew B. Stroud ("ABS") and Stroud Productions and Enterprises, Inc. ("SPE"), Andy Stroud, Inc. ("ASI") and Scarlett P. Stroud ("SPS") in her capacity as Executrix of the Estate of ABS ("Stroud Estate") ("Executrix") (ABS, SPE, ASI, Stroud Estate and Executrix are collectively referred to as "Stroud")  were not represented and took motions under submission without any argument on behalf of Stroud.  Citing ***In re Tuli,*** 172 F. 3d 707, 712 (9th Cir. 1999) the FBO expressly stated the requirement that the Court has "an affirmative duty to look into its jurisdiction over both the subject matter and the parties."

**RELEVANT FACTS**

As noted by the Magistrate in the  FBO, Steven Ames Brown ("Brown") filed a complaint against ABS and SPE in the ***Brown v. Stroud*** matter  asserting causes of action for declaratory relief and common law copyright infringement.  ABS and ASI counterclaimed against Brown and the Simone Estate.  Brown filed reply counterclaims and the Simone Estate filed counterclaims against ABS, SPE, ASI.

In ***Kelly v. Roker***, Lisa Simone Kelly ("Kelly") filed an action against ABS, ASI, Wally Roker, individually and doing business as ICU Ent. Dist. and Wally Roker Music (collectively, "Roker') asserting state law claims for conversion, accounting and fraudulent transfer under California State Law and for declaratory relief under 28 U.S.C. § 2201.  ASI counterclaimed

Exhibit 1

1   against Kelly for declaratory relief, copyright infringement, vicarious copyright infringement,

2   contributory copyright infringement, and copyright infringement under California Law.

3        ABS ("Decedent") died testate on the 14th day of July, 2012 and a petition ("Petition")

4   was filed in the Surrogate Court for the State of New York, County of Bronx, File No. 2012-

5   1964 ("Surrogate Ct.") to probate the last will and codicil of the Decedent ("Will").

6        A motion returnable before this court on October 12, 2012 was made by Brown and the

7   Simone Estate to substitute SPS for Decedent ("Substitute Motion") in these actions (459) and an

8   order was granted on October 4, 2012 on the basis that it was unopposed ("Substitute Order")

9   (470).

10       On or about October 31, 2012, an order was issued permitting Methven & Associates

11  ("Methven"), former counsel for ABS and SPE to withdraw and directing ". . .Andy Stroud, Inc.

12  ("ASI") and Stroud Productions and Enterprises, Inc. ("SPE") (wholly owned corporations

13  owned by the Decedent collectively referred to as the "Stroud Corporations") to show cause as to

14  whether they intend to find alternate counsel and, if not, why judgment should not be entered

15  against them on the claims against them and why their affirmative claims should not be

16  dismissed for failure to prosecute."  The Withdrawal Order required the Stroud Corporations to

17  respond in writing by no later than November 21, 2012.

18       Methven alleges that it advised the Court that no representative had been appointed to the

19  Stroud Estate.  (Exhibit A)  In addition, counsel for the Stroud Estate sent a letter to the Court on

20  November 20, 2012 in an attempt to advise the Court that no representative had been appointed

21  to represent the Stroud Estate.  (Exhibit A)

22       Letters Testamentary were signed by the Surrogate Ct. November 20, 2012 (and received

23  by W. Charles Robinson on or about November 28, 2012) appointing Scarlett P Stroud as the

24  Executrix of the Estate ("Executrix").

25       A petition to approve the retainer to permit W. Charles Robinson to represent the Stroud

26  Estate was filed with the Surrogate Ct. on or about December 7, 2012 and a decision was

27  rendered by the Surrogate Ct. on or about January 8, 2013 advising that the Executrix had the

28  authority to retain counsel to represent the Stroud Estate in these cases.

Exhibit 1

1    On January 17, 2013, the court per the Hon. Jeffery S. White issued a Further Order to

2    Show Cause ("FOSC") dismissing the affirmative claims of Stroud and ordering Stroud to show

3    cause why their answers should not be stricken. (497)

4    A motion to enlarge the time for Stroud to answer, oppose or otherwise respond to the

5    FSOC ("Enlarge Motion") (503) was filed on February 5, 2013. On February 8, 2013, the court

6    per the Hon. Jeffery S. White denied the Enlarge Motion (503) and issued an order

7    "DISMISS[ING] all affirmative claims by the estate of Andrew Stroud, ASI and SPE and

8    STRIK[ING] any answers that have been filed by these parties and ENTER[ING] DEFAULT

9    against them." ("Default Order").  (511)  The Default Order further directed "The parties who

10   were defending claims by the estate of Andrew Stroud, ASI and SPE in the above captioned

11   matters shall file motions for default judgment by no later than March 15, 2013. (511)

12   On March 8, 2013, a motion to vacate, declaration in support of motion to vacate and

13   memorandum in support of motion to vacate (collectively referred to as "Vacate Motion") was

14   filed on behalf of Stroud.  (517)

15   On March 12, 2013, the court **_sua sponte_** denied the Vacate Motion for **_inter alia,_**

16   (a) failure to file pro hac vice applications on behalf of SPE and ASI, (b) failure to file the

17   Vacate Motion in all three related cases, (c) the Declaration of W. Charles Robinson did not

18   contain numbered paragraphs and contained legal argument, and (d) failure to comply with Civil

19   LR. 7-9 regarding motions for reconsideration ("Vacate Denial").  (520)

20   On March 15, 2013, opposing counsel filed motions for default judgments and

21   accompanying documents.  (522, 523, 524, 529, 529-1, 529-2530,  531, 531-1, 531-2, 531-3)

22   with no hearing date.

23   On March 18, 2013, Stroud filed a motion for leave to file a motion for reconsideration.

24   (536)  On March 22, 2013, the court issued an order granting leave to file a motion for

25   reconsideration on the issues of whether Mrs. Stroud was a proper party to be substituted at the

26   time the Court granted the motion. (544)

27   On April 2, 2013, Stroud filed a motion pursuant to Federal Rule of Civil Procedure

28   (FRCP) 60(b) for reconsideration of the Substitute Motion, (459)  and upon reconsideration

Further Brief by Stroud on the Issue of Jurisdiction of District Court C 08-02348 JSW

Exhibit 1

1    pursuant to FRCP 25 to dismiss the causes of action herein against Stroud on the basis ***inter alia,***

2    that the parties had failed to substitute the proper party and failed to obtain personal jurisdiction

3    of the Stroud Estate ("Reconsideration Motion").  (551)  (156) All the other parties in the actions

4    filed a Joint Opposition to the Reconsideration Motion.  (556)

5         On May 8, 2013, the court issued the Reconsideration Order (563) finding that ". . .

6    although the Court's order substituting in SPS was premature. . ." the court nevertheless refused

7    to vacate the Substitution Order and subsequent orders dependent upon it leaving in place the

8    Default Order.

9                                   **ARGUMENT**

10       **1.  The Court does not have Subject Matter Jurisdiction in *Brown v. Stroud***

11           **Pursuant to the Copyright Act.**

12

13       As noted in the FBO, the causes of action asserted by Brown and the Simone Estate in the

14   Complaint and First Amended Complaint in ***Brown v. Stroud*** do not support the exercise of

15   subject matter jurisdiction based upon original jurisdiction under 28 U.S.C. § 1331.  In support

16   of their claim for subject matter jurisdiction under 28 U.S.C. § 1331, Brown and the Simone

17   Estate rely upon the case of ***Community for Creative Non-Violence v. Reid,*** 490 U.S. 730

18   (1989).  ***CCNV v Reid*** involved a sculpture where the artist and the organization that hired the

19   artist to create the sculpture filed competing certificates of copyright registration.   Accordingly,

20   the case involved an interpretation of the "work for hire" provisions of the Copyright Act of

21   1976.

22       In ***Brown v. Stroud,*** the basis for the ownership of the property in question is the

23   Separation Agreement of Andrew B. Stroud and Nina Simone dated September 21, 1972

24   ("Separation Agreement") (Exhibit B)  There is no question of "work for hire" or for that matter

25   copyright ownership.  The issue of ownership of the property in question is strictly a contract

26   matter between Andrew B. Stroud and Nina Simone.  The Separation Agreement provides in

27   pertinent part:

Exhibit 1

1        "…They are desirous of settling their respective property rights… and for the
2        disposition of all other rights and obligations growing out of or attaching to the
3        marriage relation…"
4

5        The Separation Agreement then sets about addressing the ownership of all creative and
6 intellectual property owned by either of them, to wit:

7        1.       Ownership of Certain Master Tapes in Schedule A attached to the Separation
8 Agreement are awarded to Nina Simone with an acknowledgement that Andrew B. Stroud has
9 copies of these tapes to be given to Nina Simone upon payment of a certain sum of money
10 (which was never paid).

11        2.       Ownership of all rights in the performances of Master Tapes in Schedule B
12 attached to the Separation Agreement is awarded to Andrew B. Stroud.

13        3.       Each party acknowledges that all other items of personal property have been
14 divided between them and neither will make a claim as to any items in the possession of the
15 other party.

16        As the foregoing clearly demonstrates, the ownership of any items in the possession of
17 the Stroud Estate pertaining to Nina Simone is owned by the Stroud Estate and any action
18 contesting such ownership is not a federal question involving copyright.  Brown's claims are all
19 based upon his agreement with Nina Simone and since her claims do not involve copyright,
20 neither does his.

21        Accordingly, there is no basis for original subject matter jurisdiction and indeed no basis
22 for an action in state court in view of the dispositive terms of the Separation Agreement.

23       **2. The Court does not have Subject Matter Jurisdiction in _Brown v. Stroud_**
24           **Based Upon Diversity.**
25

26        As noted by the Magistrate in the FBO, an American citizen who moves abroad is not a
27 citizen of any state for purposes of 28 U.S.C. § 1332(a)(1) and cannot sue or be sued in federal
28 court on the basis of diversity jurisdiction.  **_Newman-Green, Inc. v. Alfonzo-Larrain,_** 490 U.S.
29 826, 828, 104 L. Ed 2d 893, 109 S Ct 2218 (1989) In order to sue or be sued in federal court on
30 the basis of diversity jurisdiction, a person must be both a citizen of the United States and

Exhibit 1

1   domiciled in a state in the United States.  ***Newman-Green, Inc. v. Alfonzo-Larrain,*** 828.

2   Domicile requires both a physical presence at a given location and intent to remain there

3   indefinitely.  ***Lew v. Moss,*** 797 F. 2d 747 (9th Cir. 1986)  In determining intent to remain, the

4   courts consider a variety of factors including current residence, voting registration and voting

5   practices, location of personal and real property, location of brokerage and bank accounts,

6   location of spouse and family, membership in unions and other organizations, place of

7   employment or business, driver's license and automobile registration and payment of taxes and

8   the stated intent of the individual.  ***Lew v. Moss,*** 750.  There is also a presumption in favor of an

9   established domicile as against a newly acquired one.  ***Lew v. Moss,*** 747.  Finally, the person

10   asserting diversity jurisdiction has the burden of proof.  ***Lew v. Moss,*** 749.

11        Nina Simone made numerous statements that she never intended to return to the United

12   States for the remainder of her life.  In a 1999 interview with the show "Hard Talk," at

13   approximately the sixteen minute mark to the eighteen minute mark, she emphatically states that

14   she left the United States due to racism and she will never return.

15   (http://www.youtube.com/watch?v=t-a7l0Gvabk)  Even more telling are the statements of Nina

16   Simone in her own autobiography entitled "I Put A Spell On You" as outlined in the Declaration

17   of SPS attached as an exhibit.

18        As support for their claims that Nina Simone was domiciled in California, Brown and the

19   Simone Estate offer the declaration of a person who makes statements without offering any proof

20   and whose own self interest is affected by the allegations he makes.  When the clearly biased

21   statements of  Brown are compared to the words of Nina Simone herself, Brown and the Simone

22   Estate have clearly failed to meet their burden of proving that Nina Simone was domiciled in

23   California.

24        The unbiased facts establish that Nina Simone was not domiciled in California or any

25   other state in the United States.  Accordingly, the action cannot be maintained in the federal

26   court on the basis of diversity jurisdiction.  Likewise, Brown's action is entirely derived from his

27   contractual relationship with Nina Simone and hence must also be dismissed for lack of diversity

28   jurisdiction.

Exhibit 1

1      **3.  The Court does not have Subject Matter Jurisdiction in _Kelly v. Roker._**

2      The facts and legal arguments presented above apply equally to the case of _**Kelly v.**_

3 _**Roker.**_  Subject matter jurisdiction is not present because the causes of action asserted in _**Kelly v.**_

4 _**Roker**_ do not involve any federal question.  For the same reasons enunciated in _**Brown v. Stroud**_,

5 the Simone Estate lacks subject matter jurisdiction on the basis of diversity.

6      **4.  The Court does not have Personal Jurisdiction.**

7

8      Federal Rule of Civil Procedure (FRCP) 25 provides for the substitution of parties in the

9 event of the death of a party which does not extinguish the claim.  FRCP 25(a)(1) permits a

10 motion for substitution to be made by any party or the decedent's successor or representative

11 within 90 days after service of a statement noting the death of the party, otherwise the action by

12 or against the party must be dismissed.  FRCP 25(a)(3) requires the motion to substitute, together

13 with the notice of hearing, to be served on nonparties as provided in Civil LR. 4.

14      FRCP 4(e) provides for the service of an individual within a judicial district of the United

15 States by

16      (1) following state law for serving a summons in an action brought in courts of general

17 jurisdiction in the state where the district court is located or where service is made; or

18      (2) doing any of the following:

19           (A) Delivering a copy of the summons and of the complaint to the individual

20 personally;

21           (B) leaving a copy of each at the individual's dwelling or usual place of abode

22 with someone of suitable age and discretion who resides there; or

23           (C) delivering a copy of each to an agent authorized by

24 appointment or by law to receive service of process.

25      FRCP 25 provides for the substitution of parties in the event of the death of a party which

26 does not extinguish the claim.  FRCP 25(a)(1) permits a motion for substitution to be made by

27 any party or the decedent's successor or representative within 90 days after service of a

28 statement noting the death of the party, otherwise the action by or against the party must be

Exhibit 1

1    dismissed.  FRCP 25(a)(3) requires the motion to substitute, together with the notice of hearing,

2    to be served on nonparties as provided in FRCP. 4.

3            FRCP 4(e) provides for the service of an individual within a judicial district of the United

4    States by

5            (1) following state law for serving a summons in an action brought in courts of general

6    jurisdiction in the state where the district court is located or where service is made; or

7            (2) doing any of the following:

8                    (A) Delivering a copy of the summons and of the complaint to the individual

9    personally;

10                   (B) leaving a copy of each at the individual's dwelling or usual place of abode

11   with someone of suitable age and discretion who resides there; or

12                   (C) delivering a copy of each to an agent authorized by

13   appointment or by law to receive service of process.

14           The Service Declaration (464) alleges that service was accomplished pursuant to Civil

15   Practice Law and Rules (CPLR) § 308.4 of the State of New York. Civil Practice Law and

16   Rules(CPLR) § 308.4[1] provides for the personal service of a summons upon a natural person by

---

[1]   § 308. Personal service upon a natural person.  Personal service upon a natural person shall be made by any of the following methods:
  1. by delivering the summons within the state to the  person to be  served; or
  2. by delivering the summons within the state to a person of suitable age and discretion at the actual place of business,  dwelling  place  or usual  place  of  abode of the person to be served and by either mailing the summons to the person  to  be  served  at  his  or  her  last  known residence or by mailing the summons by first class mail to the person to be  served at his or her actual place of business in an envelope bearing the legend "personal and confidential" and not indicating on the outside thereof, by return address or otherwise, that the communication is  from an  attorney or concerns an action against the person to be served, such delivery and mailing to be effected within twenty days  of  each  other; proof  of  such  service  shall  be  filed  with  the clerk of the court designated in the summons within twenty days of either such delivery  or mailing, whichever is effected later; service shall be complete ten days after  such  filing;  proof  of  service  shall  identify such person of suitable age and discretion and state  the  date,  time  and  place  of service, except  in  matrimonial actions where service hereunder may be made pursuant to an order made in accordance with  the  provisions of subdivision a of section two hundred thirty-two of the domestic relations law; or
  3. by delivering the summons within the state to the agent for service of the person to be served as designated  under  rule  318,  except  in matrimonial  actions  where service hereunder may be made pursuant to an order made in accordance with the provisions of subdivision a of section two hundred thirty-two of the domestic relations law;
  4. where service under paragraphs one and two cannot be made with due diligence,  by  affixing  the  summons  to  the door of either the actual place of business, dwelling place or usual place  of  abode  within  the  state  of  the  person to be served and by either mailing the summons to such person at his or her last known residence or by mailing the summons by first class mail to the person to be  served at his  or  her  actual place  of  business in an envelope bearing the legend "personal and confidential" and not indicating on the  outside  thereof,  by  return address  or  otherwise,  that  the  communication is from an attorney or concerns an action against the person to be served,  such  affixing  and mailing  to  be effected within twenty days of each other; proof of such service shall be filed with the clerk  of  the  court  designated in the summons within twenty days of either such affixing or mailing, whichever is effected later; service shall be complete ten days after such filing, except in matrimonial actions where service hereunder may be made pursuant to an order made in accordance with  the  provisions of subdivision a  of section two hundred thirty-two  of  the  domestic  relations law;

Exhibit 1

1  several methods including delivery to the person within the state, delivery to a person of suitable

2  age and discretion at the dwelling place, or service upon an agent where an agent has been

3  designated.  When the first two methods cannot be made with "due diligence," service can be

4  accomplished by "affixing the summons to the door of either the actual place of business,

5  dwelling place or usual place of abode. . . .and by either mailing the summons to such person at

6  his or her last known residence. . ." or what has become known as "nail and mail" service.  In

7  order to utilize the provisions of CPLR § 308.4, the process server must demonstrate "due

8  diligence."  Under the laws of New York, the requirement must be strictly construed.  ***Allianz***

9  ***Ins. Co v. Otero,***  353 F. Supp. 2d 415 (2004); ***County of Nassau v. Letosky,*** 34 A.D. 23d 414,

10  824 N.Y.S. 2d 153 (2 Dept. 2006)

11        In determining what constitutes due diligence, the courts have held that a person

12  attempting to effectuate service of process under the nail and mail provisions must inquire into

13  the employment status of the person to be served to determine if the person can be served at their

14  place of employment.  ***Serraro v. Staropoli,*** 94 A.D. 3d 1083, 943 N.Y.S. 2d 201 (2 Dept. 2012)

15   (holding that plaintiffs did not exercise requisite "due diligence" where the process server did

16  not make any inquiries about defendants' work schedules or their respective business addresses);

17  ***Velocity Investments, LLC v. McCaffrey,*** 31 Misc. 3d 308, 921 N.Y.S. 2d 799 (2011) (holding

18  that process server must make effort to ascertain if defendant is employed and location of

19  defendant's place of employment and if defendant is employed, attempt to make service at the

20  place of employment); ***Faculty Practice Plan of Long Island Jewish Medical Center v.***

21  ***Guarneri,*** 13 Misc. 3d 302, 822 N.Y.S. 2d 389 (2006) (holding that while due diligence is

22  determined on a case by case basis, regardless of the case-specific circumstances, an inquiry into

23  the defendant's employment is required before utilizing "nail and mail")

24        In addition to the foregoing requirement of inquiry into the employment status of the

25  person to be served, due diligence also requires that the process server first try to identify and

26  serve a person of suitable age and discretion at the place of abode or actual place of business.

9

Further Brief by Stroud on the Issue of Jurisdiction of District Court C 08-02348 JSW

Exhibit 1

1   ***Allstate Ins. Co. v. Obdyke,*** 235 A.D. 2d 533, 652 N.Y.S. 2d 763 (2 Dept. 1997) (holding that

2   due diligence was not accomplished where process server made no attempt to serve process on a

3   person of suitable age and discretion); ***Galuski v. Tutunjian,*** 133 A.D. 2d 480, 519 N.Y.S. 2d

4   155, ***appeal denied*** 70 N.Y. 2d 606, 519 N.Y.S. 2d 1029, 513 N.E. 1309 (3 Dept. 1987) (holding

5   that failure to deliver process to a person of suitable age and discretion at the dwelling place of

6   the person to be served, where such service could have been made with due diligence, precludes

7   later use of "affix and mail"); ***Rosen v. Weinger,*** 116 A.D. 2d 636, 497 N.Y.S. 2d 483 (2 Dept.

8   1986) (holding that due diligence has not been established so as to authorize nail and mail where

9   process server has not explained why no attempt was made to serve a person of suitable age and

10  discretion)  In determining who constitutes a person of "suitable age and discretion," it has been

11  held that a doorman is a person of suitable age and discretion. ***Citadel Management, Inc. v.***

12  ***Telesis Trust, Inc.,*** 123 F. Supp. 2d 133 (2000); ***Colonial National Bank, U.S.A. v. Jacobs,*** 188

13  Misc. 2d 87, 727 N.Y.S. 2d 237 (2000); ***Palandjian v. Pahlavi, D.C. Mass.,*** 586 F. Supp. 671

14  (1984); ***Reliance Audio Visual Corp. v. Bronson,*** 141 Misc. 2d 671, 534 N.Y.S. 2d 313 (1988)

15  It has also been held that a security guard is person of suitable age and discretion.  ***Board of***

16  ***Managers of Le Trianon Condominium v. 1439 Realty Corp.,*** 186 A.D. 2d 437, 588 N.Y.S. 2d

17  565 (1992); ***Costine v. St. Vincent's Hops. & Medical Center of New York,*** 173 A.D. 2d 422

18  570 N.Y.S. 2d 50 (1 Dept. 1991); ***Cowan, Liebowitz & Latman, P.C. v. New York Turkey***

19  ***Corp.,*** 111 A.D. 2d 93, 489 N.Y.S. 2d 226 (1 Dept. 1985)

20          The Diligence Declaration alleges that the following attempts were made to effect service

21  by personal delivery:

22  "8/25/2012 7:32AM: No answer at door, no movement inside, no noise inside and no lights.

23  8/27/2012 8:40PM: No answer at door, spoke to doorman, white male, bald, 55 years of age,

24  5'10" in height, 190lbs, said that defendant has mail being held for a few weeks. Husband passed

25  away and defendant hasn't been back to apt.

26  8/28/2012 7:20 AM: No answer at door, spoke to superintendent, Chris Dimola, said Scarlett

27  Stroud's husband passed away and she has not been seen at the building in a few weeks.

Exhibit 1

1   8/29/2012 9:18AM: Spoke to Chris Dimola (superintendent) M-brw-bk-50-5'7-170 says def is

2   out of the town couple weeks after her husband's death Doorman on premises showed me a

3   bunch of mail that he is holding for defendant" (468)

4        Nowhere in the Diligence Declaration is there any indication that the process server made

5   any inquiry into the employment of Scarlett Stroud.  Likewise, the Diligence Declaration is

6   devoid of any attempt to serve a person of suitable age and discretion.  While the Diligence

7   Declaration specifically notes discussions with the doorman and superintendent of Mrs. Stroud,

8   no attempt was made to serve these parties.  The failure to comply with the due diligence

9   requirements of CPLR § 308.4 precludes the use of this provision for service of process.

10   Accordingly, Mrs. Stroud was not properly served under the provisions of CPLR § 308.4.

11        CPLR § 308.4 requires that service pursuant to its provisions include ". . .affixing  the

12   summons  to the door of either the actual place of business, dwelling place or usual place  of

13   abode  within  the state  of  the  person to be served. . ." ***Gray v. Giannikios,*** 90 A.D. 3d 836,

14   935 N.Y.S. 2d 112 (2 Dept. 2011); ***O'Connell v. Post,*** 27 A.D. 3d 630, 811 N.Y.S. 2d 441 (2

15   Dept. 2006) (holding that the due diligence requirement of rule allowing nail and mail service

16   must be strictly observed, given the reduced likelihood that a summons served by nail and mail

17   will be received)  Neither the Diligence Declaration (468) nor the Service Declaration (464)

18   establishes that service was accomplished by affixing a copy of the papers to the door of either

19   the actual place of business, dwelling place or usual place  of  abode  within  the state  of  Mrs.

20   Stroud. Accordingly, Mrs. Stroud was not properly served under the provisions of CPLR §

21   308.4.

22        CPLR § 308.4 also requires that service pursuant to its provisions include a mailing of

23   the summons to such person at his or her last known residence or by mailing the summons by

24   first class mail to the person to be served  at  his  or  her  actual place  of  business  in  an

25   envelope  bearing  the legend "personal and confidential" and not indicating  on  the  outside

26   thereof,  by  return address  or  otherwise,  that  the  communication is from an attorney or

27   concerns an action against the person to be served.  While page one the Service Declaration

28   (464) filed by Plaintiff/Counterdefendants alleges that ". . .after substituted service was made," a

Exhibit 1

1  copy of the Substitute Motion was mailed to Scarlett Stroud at her home address at 5900

2  Arlington Avenue, S-U, Bronx, New York 10471,  page three of the Service Declaration (464)

3  indicates that service was accomplished "by other means (specify means of service and

4  authorizing code section:) By personally posting on: 8/31/2012 at 7:37 PM. NY CPLR § 308.4.

5  A declaration of mailing via certified mail is attached."   The two allegations are clearly

6  conflicting and it is impossible to determine from the Service Declaration (464) whether the

7  mailing was by first class mail or by certified mail.  CPLR § 308.4 requires that the mailing be

8  made by first class mail and it must be strictly construed.  Accordingly, Mrs. Stroud was not

9  properly served under the provisions of CPLR § 308.4.

10       When service is made pursuant to Federal Rule of Civil Procedure authorizing service in

11  accordance with state law, federal courts have no authority to stray from requirements set by

12  state law.  ***New York State Nat. Organization for Women v. Terry,*** 961 F. 2d 390, ***certiorari***

13  ***granted, vacated, vacated Pearson v. Planned Parenthood Margaret Sanger Clinc***

14  ***(Manhattan),*** 113 S. Ct. 1233, 507 U.S. 901, 122 L. Ed. 2d 640, ***on remand*** 996 F. 2d 1351,

15  ***certiorari granted, vacated*** 114 S. Ct. 2776, 512 U.S. 1249, 129 L. Ed. 2d 888, ***on remand*** 41 F.

16  3d 794, C.A. 2 (N.Y.) 1992, ***see also*** ***Swaim v. Moltan Co.,*** 73 F. 3d 711, ***certiorari denied***

17  ***Gurley v. Swaim,*** 116 S. Ct. 2499, 517 U.S. 1244, 135 L. Ed. 2d 191, C.A. 7 (Ind.) 1996

18  (holding that where federal court is proceeding pursuant to state law provisions governing

19  service of process, the court is strictly bound by the letter of state law).

20       The federal court does not have jurisdiction over a party unless the party has been

21  properly served.  ***Cranford v. U.S.*** 359 F. Supp. 2d 981, E.D. Cal. 2005; ***Hickory Travel***

22  ***Systems, Inc. v. TUI AG,*** 213 F.R.D. 547, N.D. Cal. 2005; ***Bonita Packing Co. v. O'Sullivan,***

23  165 F.R.D. 610, C.D. Cal 1995.

24       If a party is not properly served, any subsequent proceedings are invalid as to that party.

25  ***Select Creations, Inc. v. Paliafito Am., Inc.,*** 830 F. Supp. 1223, 1237-1238 (E.D. Wis. 1993);

26  ***Mooney Aircraft, Inc. v. Donnelly,*** 402 F. 2d 400, 406 (5th Cir. 1968).

Exhibit 1

1        The Substitute Motion (459) was not properly served upon Mrs. Stroud.  Accordingly, the

2   court did not have personal jurisdiction over her.  Any judicial proceedings are invalid as to her

3   and should be vacated.

4        FRCP 25(a) requires the service of a formal written ". . .statement noting the death" of

5   the party on the record followed by the service of the statement on parties and nonparty

6   successors or representatives of the deceased.  ***Barlow v. Ground,*** 39 F. 3d 231 (9th Cir.1994).

7   Mention of the death of a party in pleadings does not comply with the requirements of Civil LR.

8   25.  ***U.S. v. Currency $11,331,*** 482 F. Supp. 2d 873 (E.D. Mich. 2007).  Service of the statement

9   on nonparty successors or representatives must be made in accordance with the provisions of

10   Civil LR. 4.  ***Barlow v. Ground,*** 233; ***Atkins v. City of Chicago,*** 547 F. 3d 869 (C.A. 7 (Ill)

11   (2008) (holding that decedents successors, if his estate has been distributed, or personal

12   representative, if it has not been, should certainly be served with statement of death).

13        After satisfaction of the requirements of FRCP 25 regarding the service of the

14   statement noting the death of the party, a motion for substitution may be made within 90 days

15   after service of the statement of death by any party or by the decedent's successor or

16   representative.

17        The record is devoid of any formal statement of death.  While former counsel for the

18   deceased ABS,  Methven noted the death of ABS in his Supplemental Declaration in support of

19   his motion to be released as counsel, the mention of the death of a party in pleadings does not

20   comply with the requirements of Civil LR. 25.  Moreover, Brown admitted in his Memorandum

21   in Support of Motion to Substitute Scarlett Stroud for Andrew B. Stroud that ". . .no such notice

22   has been served."  (459 at p. 7, line 7).

23        While it has been held that a motion to substitute may be made even though no statement

24   of death has been served and filed, where the motion to substitute has not been served properly,

25   the failure to serve a statement of death takes on added significance.  The failure to serve the

26   Substitute Motion (459) properly coupled with the failure to serve a statement of death  renders

27   the motion invalid.  Accordingly, the court does not have personal jurisdiction over Mrs. Stroud

28   and any judicial proceedings are invalid as to her and should be vacated.

Exhibit 1

1    FRCP 25(a)(1) provides for the court to order substitution ". . .of the proper party"  in the

2    event of the death of a party where the claim is not extinguished.  While Civil LR. 25 does not

3    define the term "proper party," the courts have held that a proper party is the same entity that

4    may make a motion for substitution on behalf of the decedent: namely, the decedent's successor

5    or representative.  ***In Re Baycol Products Litigation,*** 616 F. 3d 778 (8th Cir. 2010).  The

6    question of who is a successor or representative is a substantive issue for which the federal court

7    has to rely upon state law.  ***In Re Baycol Products Litigation,*** 616 F. 3d at 785, 788.

8    Under New York State law, the representative of a deceased party's estate who can

9    substitute for that party in a civil action is the person who has received letters to administer the

10   estate of the decedent.  ***Graham v. Henderson,*** 224 F.R.D. 59 (N.D.N.Y. 2004).   A "successor"

11   under New York State Law has been determined to be (1) a distributee of the estate if the

12   decedent's estate has been distributed at the time the motion for substitution is made, (2) a

13   person named in a will as the executor of the decedent's estate, even if the will is not probated or

14   (3) the primary beneficiary of an unprobated intestate estate which need not be probated.   ***In Re***

15   ***Baycol Products Litigation,*** 616 F. 3d at 784,5; ***See also Kernisant v. City of New York,*** 225

16   F.R.D. 422 (E.D.N.Y. 2005) (holding that the proper party for substitution of deceased party is

17   either (1) a successor of the deceased party, such as a distributee of an estate if the estate of the

18   deceased has been distributed at the time of the motion for substitution has been made, or (2) a

19   representative of the deceased party, such as a person lawfully designated by state authority to

20   represent the deceased party's estate).  Where there is no appointed representative, the District

21   court should look at the facts and circumstances of each case and conduct an evidentiary hearing

22   to determine the proper party for substitution.  ***In Re Baycol Products Litigation,*** 616 F. 3d at

23   788.

24   The death of a party whose estate is located in New York divests the court of jurisdiction

25   until a duly appointed representative is substituted for the deceased party.  ***Brown v. Konczeski,***

26   242 A.D. 2d 847, 662 N.Y.S. 2d 891 (3d Dept 1997).  Any judicial proceedings taken prior to the

27   appointment of the representative of the decedent's estate are unenforceable against the estate.

28   ***In re Estate of Einstoss,*** 26 N.Y. 2d 181, 309 N.Y.S. 2d 184, 257 N.E. 2d 637 (1970); ***See also***

Exhibit 1

1   ***F.A. Mfg. Co. v. Hayden & Clemons,*** 273 F. 374 (1st Cir. 1921) (holding that proceeding is

2   merely suspended until the representative of the deceased party becomes a party to the

3   litigation).  Before a motion to substitute can be granted, a representative of the estate must be

4   named.  ***Smith v. Planas,*** 151 F.R.D. 547 (S.D.N.Y. 1993) ***citing Matter of Estate of Garfinkle,***

5   119 A.D. 911, 500 N.Y.S. 2d 863 (3 Dept. 1986) for the proposition that the estate has no

6   representative until appointed pursuant to the New York Surrogate Court Procedure Act (SCP)

7   §§ 1002(1), 1402(1)(c) and any motion to substitute must be denied until such appointment.

8       The proper party to represent the Estate of the Decedent is Scarlett Stroud.  However,

9   under New York State Law, she had no right to represent the Estate until she was formally

10  appointed. While she was the executrix designated in the Will, she had no power or authority to

11  represent the Estate let alone make decisions in complex litigation affecting the assets of the

12  Estate until her formal appointment under New York Law.  Notwithstanding that she is a

13  beneficiary under the Will, and arguably the primary beneficiary, her appointment as the

14  executrix is subject to objection by any distributee which in this case includes two sons of the

15  Decedent as well as Lisa Simone Kelly, the daughter of the Decedent and an opposing party in

16  these actions.

17      Under the test enunciated in ***In Re Baycol Products Litigation,*** 616 F. 3d at 784,5, Mrs.

18  Stroud was not a distributee of an estate where the estate had been distributed at the time the

19  Substitute Motion (459) was made.  While she was the executrix named in the Will, this was not

20  a case where the Will was not being probated.  Probate proceedings had been timely commenced

21  and were being diligently pursued.  Finally, while Mrs. Stroud is a beneficiary of the Estate, and

22  may end up being the primary beneficiary, the Estate is being probated.  Accordingly, Mrs.

23  Stroud is not the successor of the decedent and until she was appointed as the Executrix, she was

24  not the representative of the Estate.

25      On the basis of the foregoing, Mrs. Stroud was not a proper party at the time of

26  commencement of the Substitution Motion and the Court did not have personal jurisdiction of

27  her, and all orders, decisions and judicial proceedings taken after the Substitution should be

28  vacated.

Exhibit 1

**CONCLUSION**

On the basis of the foregoing, the cases lack subject matter and personal jurisdiction and default judgment should be denied and the cases dismissed.

Dated:  January 22, 2014                    C. ROBINSON & ASSOCIATES, LLC

BY:_____/s/_____

W. Charles Robinson
Attorneys for Defendants and Counter-
Plaintiffs Stroud
820 Second Avenue, Ste. 7B
The Diplomat Center
New York, N.Y. 10017
(212) 286-0423 (Tel)
(212) 286-0450 (Fax)
wcr@crobinsonllc.com

**THERESE Y. CANNATA** SBN 88032
Cannata, Ching & O'Toole, LLP
100 Pine Street
San Francisco, California 94111
415/409-8900 Tele
415/409-8904 Fax
tcannata@ccolaw.com
Attorneys for Plaintiff Brown

**DOROTHY M. WEBER**, *pro hac vice*
Shukat, Arrow, Hafer, Weber &
Herbsman, LLP
111 West 57th Street, Suite 1120
New York, New York 10019
212/245-4580 Tele
212/956-6471 Fax
dorothy@musiclaw.com
Attorneys for Estate of Nina Simone

1
2   **JULIA GREER, Esq.** (Bar No. 200479)
3   COBLENTZ, PATCH, DUFFY & BASS, LLP
4   One Ferry Building, Suite 200
5   23 San Francisco, CA 94111-4213
6   415/391-4800 Tele
7   415/989-1663 Fax
8   jdg@cpdb.com
9   Attorneys for Third Party Defendant

10  **STEVEN AMES BROWN**
11  Entertainment Law 83363
12  69 Grand View Avenue
13  San Francisco, California 94114-2741
14  415/647-7700 Tele
15  415/285-3048 Fax
16  sabrown@entertainmentlaw.com

17

18

19

20
21
22
23
24
25

26

Further Brief by Stroud on the Issue of Jurisdiction of District Court C 08-02348 JSW

Exhibit 1

| Filters Used: | | # Email Report | | Date Printed: **1/22/2014** |
|---|---|---|---|---|

Filters Used:

1 Tagged   Record

# Email Report

Form Format

Date Printed: **1/22/2014**
Time Printed: **5:01PM**
Printed By: **CHARLES**

---

| Date | **10/24/2012** Time | **6:12PM   12:00AM** | Duration | **0.00** (hours) | Code | **Matters-Rel** |
|---|---|---|---|---|---|---|
| Subject | **RE: More on the Stroud cases** | | | | Staff | **W Charles Robinson** |
| Client | **Bruce E. Methven** | | MatterRef **IN RE ESTATE OF ANDREW B STRO** | MatterNo **12-2015** | | |
| From | **Bruce E. Methven <bmethven@methvenlaw.com>** | | | | | |
| To | **'Charles Robinson' <wcr@wcrobinsonassociatesllc.com>** | | | | | |
| CC To | **'Scarlett Stroud' <spstroud@earthlink.net>** | | | | | |
| BCC To | | | | | | |

| Reminders | . | (days before) Follow | Done | Notify | Hide | Trigger | Private | Status |
|---|---|---|---|---|---|---|---|---|
| User1 | | | | User3 | | | | |
| User2 | | | | User4 | | | | |

**Hi Charles:**

Sanctions orders in federal court can't be appealed until the end of a case.  I don't know without doing some research whether the order substituting in Scarlett for Andy is appealable or not.  Probably more important, I'm not the attorney for the probate and there's no executrix yet to retain an attorney.  I'm happy to help where I can, but I don't think I have the standing to appeal from that order.

**Regards,
Bruce**

—————

From: Charles Robinson [mailto:wcr@wcrobinsonassociatesllc.com]
Sent: Wednesday, October 24, 2012 9:18 AM
To: 'Bruce E. Methven'
Cc: 'Scarlett Stroud'
Subject: RE: More on the Stroud cases

**Bruce,**

I'm referring to any and all orders issued after the death of Mr. Stroud.  Do you think you should move to vacate these orders in view of the fact that you feel the court had no authority to issue them?  How about maybe appealing the orders?  What do you think?

**Charles**
----- Original Message -----
From: Bruce E. Methven <bmethven@methvenlaw.com>
To: 'Charles Robinson' <wcr@wcrobinsonassociatesllc.com>
Sent: 10/23/2012 8:40PM
Subject: RE: More on the Stroud cases

**Hi Charles:**

I assume you mean the one that says "Mrs. Stroud has not been appointed the representative of the estate and unless and until such time, she has no authority to represent the estate."  I do truly understand; you've made the application and the probate court (Surrogate's Court) must approve it.

---

Exhibit 1

| Filters Used: | **Email Report** | Date Printed: | **1/22/2014** |
|---|---|---|---|
| 1 Tagged   Record | Form Format | Time Printed: | **5:01PM** |
| | | Printed By: | **CHARLES** |

Judge White, though, has substituted in Scarlett personally for Andy in the cases here, although it still is not clear to me how he has the authority to do that.

Regards,
Bruce

——

From: Charles Robinson [mailto:wcr@wcrobinsonassociatesllc.com]
Sent: Tuesday, October 23, 2012 2:08 PM
To: 'Bruce E. Methven'
Cc: 'Scarlett Stroud'
Subject: RE: More on the Stroud cases

Bruce, I suggest you review my previous e-mail.

Charles
----- Original Message -----
From: Bruce E. Methven <bmethven@methvenlaw.com>
To: wcr@wcrobinsonassociatesllc.com
Sent: 10/22/2012 9:17PM
Subject: More on the Stroud cases

Dear Charles:

Judge White's minute order regarding the sanctions is attached. As we've discussed, though, it doesn't tell the whole story. Even though I explained that the court handling the probate has not yet appointed Scarlett as Executrix, Judge White was very unhappy that Scarlett has not retained an attorney who has appeared in the three cases here. He said that unless the sanctions are paid and Scarlett has retained an attorney, then he likely will dismiss all Stroud answers and complaints and award judgments in everything in favor of the Estate, Brown and Sony.

I think it would be wise to do as much as you can to push the court to speed the appointment of Scarlett as Executrix.

Regards,
Bruce

——

Bruce E. Methven | Methven & Associates | 2232 Sixth Street | Berkeley, CA 94710 | phone:  510 -649-4019 | fax:  510-649-4024 | www.methvenlaw.com | bmethven@methvenlaw.com

The information contained in this e-mail is confidential and intended only for the use of the person or entity identified as the recipient. Any other transfer, distribution or copying is prohibited under the attorney work-product and attorney-client privileges. If you have received this email in error, please immediately notify us by e-mail and delete this transmission.  (State Compensation Ins. Fund v. WPS Inc. (1999) 70 Cal.App.4th 644.)

——

Exhibit 1

| Filters Used: | **Email Report** | Date Printed: **1/22/2014** |
|---|---|---|
| **1 Tagged   Record** | Form Format | Time Printed: **5:01PM** |
| | | Printed By: **CHARLES** |

Exhibit 1

November 20, 2012

VIA E-MAIL: JSWpdf@cand.uscourts.gov; jswcrd@cand.uscourts.gov

Hon. Jeffery S. White
United States District Judge
United States District Court
Northern District of California
450 Golden Gate Avenue
San Francisco, CA 94102

Dear Judge White:

I am the attorney handling the filing of the petition for the probate of the Estate of
Andrew P. Stroud ("Estate").  To Date, no representative has been appointed to the
Estate.  In the absence of a representative, the Estate can not comply with the order of the
court dated October 31, 2011 (sic).

This information is being provided for the benefit of the court.

Sincerely yours,

**C. ROBINSON & ASSOCIATES, LLC**


W. Charles Robinson

CR

NOTE: *DOCUMENT 590-2* OMITTED.

Exhibit 1

1    Pursuant to Local 3-4(a) (1), please see signature page for list of parties.

2

3

4

5

6

7                        UNITED STATES DISTRICT COURT

8                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

9    STEVEN AMES BROWN,

10              Plaintiff,                    C 08-02348 JSW

11        v.                                  C 09-03796 JSW

12   ANDREW B. STROUD, et al.,                C 11-05822 JSW

13              Defendants.

14   _____/        **DECLARATION OF SCARLETT P. STROUD**

15                                            **IN SUPPORT OF FURTHER BRIEF ON THE**

16   ANDREW B. STROUD, et al.,                **ISSUE OF JURISDICTION**

17              Plaintiffs,

18        v.                                  Date:  January 22, 2014

19   CASTLE ROCK ENTERTAINMENT, et al.,       Magistrate:  Hon. Nathanael M. Cousins

20              Defendants.

21   _____/

22   LISA SIMONE KELLY,

23              Plaintiff,

24        v.

25   WALLY ROKER, et al.,

26              Defendants.

27   _____/

28

29

Declaration of Scarlett P. Stroud in Support of Stroud Further Brief on Jurisdiction 13-1079 JSW

Exhibit 1

1       I, SCARLETT P. STROUD, declare as follows:

2

3       I am the widow of the late Andrew B. Stroud ("ABS") and the duly appointed Executrix of the Estate of ABS ("Estate") in the Surrogate Court for the State of New York, County of Bronx, File No. 2012-1964 ("Surrogate Ct.").

### HISTORY

1.      Andrew B. Stroud ("Decedent") died testate on the 14th day of July, 2012.  A petition ("Petition") was filed in the Surrogate Court for the State of New York, County of Bronx, File No. 2012-1964 ("Surrogate Ct.") to probate the last will and codicil of the Decedent, bearing the dates of April 14, 1994, and February 29, 2012, respectively on or about July 31, 2012 (collectively referred to as the "Will").

2.      Defendants Stroud Productions and Enterprises, Inc. ("SPE") and Andy Stroud, Inc. ("ASI") were corporations wholly owned by the Decedent.

3.      SPE was dissolved on June 24, 1981 and ASI was dissolved on July 26, 2012 (Exhibit A).

4.      I am not an officer, director, managing or general agent, or cashier or assistant cashier or to any other agent authorized by appointment or by law to receive service on behalf of SPE or ASI.

5.      Nina Simone ("Simone") authored an autobiography entitled "I Put a Spell On You" ("Autobiography") in 1991.

6.      The Autobiography is replete with references by Simone indicating that she had no intention of ever returning to live in the United States due to the pervasive racism she experienced.   The references include the following statements in her Autobiography:

"But those weren't my thoughts as I prepared to leave America behind me once and for all." (Autobiography p. 138)

"I rushed around sorting out as much as possible until I couldn't stand it any longer and caught the first plane back to Liberia, **back home**." (Autobiography p. 141) (Emphasis Added)

""I keep the tape in my apartment in Los Angeles, and …" (Autobiography p. 150)

1     "It was only when we left the USA that we had a chance to try and behave like an

2 average mother and daughter." (Autobiography p. 151)

3     "So I moved to Switzerland with her." (Autobiography p. 153)

4     "...I'd be going back into the dirty, dishonest world I'd left America to escape."

5 (Autobiography p. 158)

6     "I was desperate to get out, to get back home, wherever that was." (Autobiography p.

7 163)

8     "As I started to look around for a home base in Europe Gerrit suggested I buy an

9 apartment in Nijmegen, Holland, close to where he lived." (Autobiography p. 174) (Exhibit B)

10     7.    Simone died and was buried in France on April 20, 2003 without ever returning to

11 live in the United States as she had promised she would never do.

12     Pursuant to the laws of the United States, I declare under penalty of perjury the foregoing

13 is true and correct.

14 Dated: January 22, 2014

15

16                         BY: _Scarlett P Stroud_

17                            Scarlett P. Stroud

18

19 **THERESE Y. CANNATA** *SBN 88032*

20 *Cannata, Ching & O'Toole, LLP*

21 *100 Pine Street*

22 *San Francisco, California 94111*

23 *415/409-8900 Tele*

24 *415/409-8904 Fax*

25 *tcannata@ccolaw.com*

26 *Attorneys for Plaintiff Brown*

27

28 **DOROTHY M. WEBER**, *pro hac vice*

29 *Shukat, Arrow, Hafer, Weber &*

30 *Herbsman, LLP*

31 *111 West 57th Street, Suite 1120*

32 *New York, New York 10019*

33 *212/245-4580 Tele*

34 *212/956-6471 Fax*

Exhibit 1

1   dorothy@musiclaw.com
2   Attorneys for Estate of Nina Simone
3
4   **JULIA GREER, Esq.** (Bar No. 200479)
5   COBLENTZ, PATCH, DUFFY & BASS, LLP
6   One Ferry Building, Suite 200
7   23 San Francisco, CA 94111-4213
8   415/391-4800 Tele
9   415/989-1663 Fax
10  jdg@cpdb.com
11  Attorneys for Third Party Defendant

12  **STEVEN AMES BROWN**
13  Entertainment Law 83363
14  69 Grand View Avenue
15  San Francisco, California 94114-2741
16  415/647-7700 Tele
17  415/285-3048 Fax
18  sabrown@entertainmentlaw.com

19

20

21

22
23
24
25
26
27

28
29

Exhibit 1

Exhibit "A"

Exhibit 1

I PUT A SPELL ON YOU

of my ancestors before slavery, when they were free. Liberia had been founded by freed slaves returning to settle in Africa, and their descendants made up the most prosperous section of Liberian society – people like the Dennis family, the Parkers, the Brights, the Tubmans and the Tolberts, with the new president among them. Liberia and America were connected through history in a positive way, and Liberian culture and society reflected that. It was a good place to start at for any Afro-American looking to reconcile themselves to their own history.

But those weren't my thoughts as I prepared to leave America behind me once and for all. I was seduced by the Africa in my mind, my mythical home. My Africa had no countries, just hundreds of different peoples mixed through history into a rough cocktail and forced to seed an exiled nation in a far-off country: my great-grandfather, Grandma, Daddy, Momma, me.

Miriam understood my idea of Africa because she was 'Mother Africa', famous and loved throughout the continent and a friend of kings and princes, prime ministers and presidents. She was also smart enough to realize that modern Africa might overpower an innocent Afro-American like me, and so for my first step she chose Liberia, a place where I could relish the differences and yet still feel secure with the similarities.

Lisa and I hardly had anything to pack, so we just upped and went. We – the three of us, including Miriam – arrived in Monrovia on 12 September, Lisa's birthday. There was an official reception for us at the airport – Miriam got this treatment wherever she went in Africa but they knew all about my coming too – and we just had time to change and rest a little before we were driven to the Presidential Palace to be guests of honour at a special party. I met the president, vice-president and all the other cabinet members, shook hands with ambassadors and emissaries and drank champagne all night long. Everyone in Liberia knew who I was, and most of them had at least one or two of my records – I was flattered but not surprised, remembering that Miriam had first heard me on the radio in South Africa all those years ago. Liberians are naturally affectionate, open people, proud of their country, and the fact that a famous black American had decided to come home – which was what they called it – to stay, meant something special to them. It felt as if the whole country had turned out to celebrate my arrival; I was overwhelmed

138

Exhibit 1

ɔN YOU                                              I PUT A SPELL ON YOU

ιce poured me more champagne
– he made me laugh, he was so
ɗ he was sure I had never really
n't worry, Nina, I'm here to take
. because these were early days,
ιt before I got round to making

ɔn wasn't going to work he took
ɔlace called the The Maze. It was
ople, but most of Liberian high
ιe I got there I'd drunk a bottle
eling just fine. I started dancing,
ss and the music got to me all at
ng my clothes off while I danced,
ɔting, feeding me champagne. I
ed naked for at least two hours,
wrote a song about it, 'Liberian
ιe, so happy to be in town at a
laughed and clapped rather than

alone – I was myself again, and
ɾ a moment I was scared because
. got around town and even the
was the woman 'who came from
e?'. I thought the president might
deport me, a prospect I couldn't
day, when I heard the president
before hoping to catch a repeat
ᴇady, that proved Liberia was my

ιd been living in my house on the
t was, a little way outside of the
ɑr enough from Monrovia's noise
e and quiet whenever I wanted
ɗ embassy receptions I mixed with
ιd at the beach I hung out with
nix and I felt I knew everybody. I
ɦemory hadn't disappeared – they
ɗ tormented me less often. I still

0

thought of Daddy sometimes, and when I did I became unhappy again, mainly because I didn't know what I thought about him, I was still so confused.

I had arrived in Liberia with no idea of how long I intended to stay; after a few hours I knew it was going to be a long, long time – forever, if everything worked out – and so I had to return to the USA to arrange for money to be sent to me and to pick up some of my things and let people know where I was. I put the trip off again and again but eventually I couldn't wait any longer, so I left Lisa in the care of the president's daughter and flew back to New York. I flinched at every noise, expecting the terrible events that always hit me when I arrived in the country that had disowned me. But this time nothing terrible happened except that I got depressed and longed for Liberia and my house on the beach. America was Daddy, and he got under my skin. I rushed around sorting out as much as possible until I couldn't stand it any longer and caught the first plane back to Liberia, back home.

It seemed like a normal flight, but it was the start of the amazing experience I mentioned when I was describing Daddy's sickness back in Tryon when I was a young girl, all that time ago. I had called Liberia to let them know I was coming, and when I got off the plane in Monrovia one of my best Liberian friends, Millie Buchanan, was waiting in the arrivals lounge. Millie took one look at me and said, 'I've got to take you somewhere right now.' I looked at her like she was crazy and asked her what she was talking about, but she wouldn't say anything more. She just bundled me and my luggage into her car and we drove off. We went to a part of the city I hadn't seen before and stopped outside a little house. Millie took me into the house and made a call, and a little while later an ordinary-looking man came to the door, dressed in a neat, grey suit.

He was a witch doctor. Before I lived in Liberia I thought African witch doctors dressed in bizarre clothes and carried skulls on sticks around with them, but that was just the result of ignorance and western prejudice against African medicine. I knew enough about Africa by now to understand there was nothing weird about tribal medicine or what it could do. But I was still puzzled about why I had been brought to see this man. Millie told me she had known there was something wrong as soon as I got off the plane but she couldn't tell what it was, so she'd called in an expert. The tribal doctor – this ordinary-looking man – took some small bones out of his jacket pocket

141

Exhibit 1

I PUT A SPELL ON YOU

There was a military coup in Liberia in 1980 and Samuel Doe took power. President Tolbert was murdered in the presidential mansion and other people associated with the Government were rounded up and paraded naked through the streets of Monrovia. Then ten of them were taken down to the beach, tied to palm trees and shot. C.C.'s son was one of those ten men. Clarence, the man who first took me to The Maze, was another.

C.C. Dennis died two weeks later, his heart broken. Before he died he burnt his house to the ground so Samuel Doe's men couldn't take it. They say C.C. and Martha Prout were among those people paraded naked through the streets. It could have been me.

Malcolm; Martin; Daddy; C.C.; all the greatest men I have known have died, taken away before I was ready to leave them. I have a videotape of the execution of C.C.'s son, given to me by a Liberian official who escaped after Samuel Doe took over. I keep the tape in my apartment in Los Angeles, and when I'm feeling blue and thinking of C.C. I take it out and watch it again. The horror of it makes my memories of C.C. more real.

150

Exhibit 1

) and Samuel Doe took
e presidential mansion
nent were rounded up
rovia. Then ten of them
es and shot. C.C.'s son
ho first took me to The

broken. Before he died
)oe's men couldn't take
g those people paraded
me.
est men I have known
) leave them. I have a
en to me by a Liberian
ver. I keep the tape in
eeling blue and thinking
horror of it makes my

# Chapter 10

I lost C.C. in 1974 but I stayed in Liberia for two more years. It was hard knowing he was around and hearing about him from mutual friends; the hardest part was staying friends with his daughter-in-law Doris Dennis, but I determined not to let him come between us. We walked on the beach one evening as I told her what had happened; we laughed, cried, and then everything was fine between us again.

I might not have had C.C. but I still had Lisa. Through the years I had tried – constantly – to be a mother to her, but our life together had been a series of partings and reunions, partings and reunions, with neither of us knowing how long it would be before we were separated once more. When she was very young Andy and I had taken Lisa on the road, but that stopped as soon as she reached school age. I was glad – touring was no life at all, never mind a normal family life. I wouldn't take a dog on the road through choice, much less my daughter.

So it had been hard for Lisa, sharing me with the music industry, the movement and her father. On tour I missed her endlessly, and when I got home I would go crazy trying to show her how much I loved her, trying somehow to work off my guilt. I would surround Lisa with a suffocating love in my effort to make her forget I'd ever been away. It was only when we left the USA that we had a chance to try and behave like an average mother and daughter. In Barbados and Liberia we were able to live normally and have fun without having to worry about the calendar on the wall.

Lisa was entirely happy in Liberia, at school and at home. Seeing her that way gave me comfort on those days when memories of C.C. crowded back in and I brooded on what I'd lost. In time I moved back into the Liberian high life. Miriam made sure I was kept busy whenever she was in Monrovia, and I started off on another set of

151

Exhibit 1

OU

...duced me to a Frenchman
...oth felt the attraction right
...I had ever known, and we

...go to the movies. I said yes
...ar. I didn't know he could
...but he said it was fine and
...been at the wheel of a car
...oads with him laughing and
...ror. At last, inevitably, we
...d over into a ravine; the car
...eet below. We both crawled
...aught a lift back into town.

...rian policemen appeared at
...and wanted to question me
...re more concerned that my
...hing else. One of them said,
...ou like Liberian men?' I said
...They went off to talk it over
...imone, the only way to solve
...hey did. They took him into
...norning. Our affair was over
...a came round to my house,
...n. I looked at him. 'You liked
...like me too, because I'm not
...o Doris Dennis's house. She
...uy and threw him out. That
...an police. I knew how cops
...after all – but Liberian law
...e.

...nteen policemen happened
...on of accepting that in Africa
...nly be able to relax once you
...uptight about being in Africa
...aw it for what it was. Closed

Liberia for ever I was getting
...was settled in a school in

Monrovia, a good school, but I wanted her to move to a better one out in the country. She wouldn't hear of it, and we started having big fights about it. The more we argued the more conscious I became of a telephone conversation I'd had with Prime Minister Earl Barrow when I was in New York. After a while he had started talking about Lisa and about how difficult it must be for her to see only her mother or father at any one time, and how strange she must feel moving around from place to place. He suggested I should put Lisa in a boarding school for three years; it would give her stability, and I would be able to plan my own future knowing that Lisa was taken care of. Deep down I knew he was right, and it seemed to me that if Lisa was going to get so upset about a local move I might as well get the unpleasant business over with and put her in a school where she could settle down properly.

My mind set, I found a school in Switzerland, enrolled Lisa for the next term and started to organize our move. Earl Barrow had advised me not to see her while she was at school, in fact to leave her alone for those three years so that she could learn to be independent; but the thought of not seeing my daughter for so long was more than I could bear. Much as I loved Liberia I knew I wouldn't be happy if I stayed in the knowledge that Lisa was thousands of miles away, alone, in a cold white country. So I moved to Switzerland with her.

Just as I was ready to leave Liberia I was introduced to an East African man who had arrived in Liberia via Chicago. His name was Imojah. He owned a farm in East Africa but had fallen out of favour with his government so had decided to leave his home country for a while until things sorted themselves out. He was also a writer, and spent his exile working on the book that his farm responsibilities had always stopped him from finishing. Imojah was about six feet six, thin, dark-skinned, with a voice like bells and large hands. I have never met anyone like him sexually, before or since. He didn't even have to touch me sometimes – just being near him was enough. Half an hour after we had met we were in bed, and it was the most natural and inevitable thing in the world.

Imojah was like a slap in the face from fate – coming to Liberia when he did, just after I had made all the arrangements to go to Switzerland and Lisa had finally been persuaded to go. All of a sudden the hundred days before we were due to leave started to fly past, and as the deadline grew closer and closer the thought of leaving Imojah

153

Exhibit 1

I PUT A SPELL ON YOU

I knew what they meant: they weren't going to get involved in a dispute between foreigners, especially black foreigners. And they weren't going to take the word of a woman against a man. They left.

I could hardly speak, I was in such pain and so upset. I sent the hotel staff away and lay on the bed crying. I was so alone – there wasn't a single person in the whole country I could call for help. I had no money, I could hardly move, and if I tried to leave the hotel I would be arrested for not paying the bill. My career as a musician was slowly falling to pieces because I had no organization, and I couldn't stay in my own country for more than a couple of weeks before I had to flee like a runaway slave. The men that might have saved me had died or were lost.

I thought of Imojah, who had seemed something definite to hold on to amidst the chaos of the rest of my life. Even he was gone, and now I didn't have the hallucinations to console me. I felt like I'd come to nothing, just another lonely woman stuck in a hotel bedroom in an unfriendly land. I reached over to the table at the side of the bed and took hold of my bottle of sleeping pills. I counted out thirty-five and took them, one by one.

I woke up in hospital with a sore stomach, my neck in a brace and all the papers full of news of my suicide attempt. One of the hotel staff had come back into my room to ask some questions about insurance, found me and called an ambulance. It was now thirty-six hours later. I lay there thinking. I was glad I hadn't died; at least, I thought, I couldn't get any lower than this – it would be uphill from now on.

I spent a couple of weeks recovering on a health farm a little way outside London and as I sat in my room – with a plaster brace around my neck – I thought carefully about what I was, and what I could do to get some control over my life. If I went home I'd be stuck between a rock and a hard place, going out of my mind in Switzerland wishing I'd stayed in Liberia, missing Imojah, knowing at the same time that if I gave in to the slimy charms of promoters begging me to perform – they always said it was because my public was so anxious to see me again, not because they wanted to make a lot of easy money – then I'd be going back into the dirty, dishonest world I'd left America to escape. I also knew Switzerland was no friend to the poor; I had at least some money – less as each day went by – which was why I was made so welcome: there was no other reason. But I wasn't getting what was mine by right from the States, and Switzerland wasn't

158

Exhibit 1

YOU

I PUT A SPELL ON YOU

oice and he mispronounced
h.' He said, 'You're name is
n the south. Well, I am, too,
e in jail now, you're not in
.' I was terrified. My lawyer
amed for Andy but he was
y the guy let me out, just as
was going on. Andy came in
men's room all that time. I
e guy started to take my
ng to arrest me on further
want to be there if they did
we first went into that room
shed as soon as the trouble
gone.

e. It seemed to me that Andy
villing to exercise the control
of touring, every little thing.
nan I didn't know to pay me
noney with me himself. That
ight have been a little naive
e, but, naive or not, it was a
ce.

were no major disasters, but
es in Europe. The difference
rom the tax charges – which
e general unease I felt about
witzerland and Cannes my
reason for accepting the tour
ection of a proper manager
gether. As the Carnegie Hall
a big mistake in coming to
Martland found me guilty as
y said he would take care of.
USA would take another ten

idgement was partly respon-
n America again, with Andy,
n't ready to face. At last I

couldn't stand it any longer and caught a cab to the airport. I was
desperate to get out, to get back home, wherever that was. Carnegie
Hall and the Newport Jazz Festival would have to wait a little longer
before they saw me again. My greatest regret was letting down George
Wein – the promoter – who had been a faithful supporter of mine over
the years.

When I fled from New York he had to cancel the shows at very short
notice and refund all the ticket money – the shows had sold out – and
I would have understood if he'd been furious. He wasn't, he was very
kind, and he issued a press release saying he regretted my actions but
understood the pressure I was under. It was a very generous thing for
George to say, and I've never forgotten it.

I arrived back in Europe knowing I couldn't go back to America until
I felt totally prepared, and that if I lived much longer in Switzerland
I would go insane. I played a few jazz festivals in the summer but I
was just drifting, trying to find something to hold on to amidst all the
uncertainty. I had started up my musical career almost by accident,
simply because I happened to be living in countries where people
wanted to see me perform, and it was totally the wrong way to go
about doing things – agreeing to perform first and thinking about
getting the right staff together second. I hadn't really got out of my
African frame of mind and I'm sure the Swiss and everyone else
thought I was crazy. My mind was full of memories of Imojah, C.C.
and Daddy. C.C. especially, as I realized the security I had thrown
away by losing him.

I played the Festival Hall in London and immediately afterwards
was asked to tour Israel. I felt it was exactly what I needed – to go to
the Holy Land, get in touch with myself and with God, and think
things through. Best of all, the tour was arranged so I could be in
Bethlehem on Christmas Day. I called Momma to tell her, and for once
she was pleased to hear my plans. I flew to Tel Aviv with Max Cohen
– my lawyer for all those years – and his wife. I fell asleep on the El
Al plane after we took off and when I woke up there was a line of
people standing in the aisle, queueing up. I thought they were waiting
to use the bathroom or something, but they were all standing looking
at me, waiting for me to wake up so they could hug and kiss me and
welcome me to their country. They said they had been waiting for me
to come for over ten years. The newspapers were full of the news of
my arrival, and when I got off the plane the Mayor of Tel Aviv was

163

2/92 Printed in the U.S.A. © 1992 Random House, Inc.

Exhibit 1

I PUT A SPELL ON YOU

being on the road with me for a while Raymond did, too, that the people would come.

Raymond and I established a regular series of concerts throughout Europe and my mind turned away from the road back to my domestic life. I had an apartment in Hollywood, but that wasn't too much use when I had a week to burn in between dates in Europe. For the time being I'd had enough of Paris and what I needed was a quiet place to come home to where I could relax, and which would contrast with the hectic high-powered atmosphere of luxury hotels in capital cities.

Once, in the mid-sixties, I gave a concert in Central Park, New York. The movement was at its height at that time and both my performance and the audience that day was fiercely political. The crowds pressed close to the front of the stage and Andy, standing behind me in the wings, got worried that the stage would be crushed under the audience's collective weight and me along with it. He started to move me off the stage, helped by a young Dutch photographer, Gerrit De Bruin. From the audience's point of view it looked like my performance was being stopped by some unknown white man. They didn't understand what was really going on and pressed forward angrily. The stage started to buckle and we just made it to the Mercedes before the crowds surged in around us. Andy pushed Gerrit on to the floor of the car so they couldn't see him and we slowly pushed our way through the masses, holding our breath and hoping he wouldn't be noticed.

It was a terrifying experience and Gerrit and I became firm friends from that moment on. As time passed I came to rely on him more and more. Soon after Andy and I had split up, I was stuck in Europe feeling down. Gerrit saw my mood, packed me and my suitcases into his little car, and we set off on a driving tour, staying in small hotels without calling up to make reservations, eating in tiny restaurants in alpine villages. Every so often people would think they recognized me but then dismiss the notion because they thought there was no way Nina Simone would be seen in the sort of places we were in. Gerrit and I had a wonderful time, and coming when it did it saved my skin. As I started to look around for a home base in Europe Gerrit suggested I buy an apartment in Nijmegen, Holland, close to where he lived. I liked the idea and Gerrit helped me to move in and took care of all the hundreds of problems that turn up when you move to a new country. He came on the road with me as well, sorting out problems

174